UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
ERETZ GOSHEN FARMS INC., WARNER P. BASS AKA
YISROEL BASS

                                Plaintiff,

                    -against-

AUTO CURE LLC, COLE DUCEY, JOSEPH DUCEY

                              Defendants.
-----------------------------------------------------------------------X

Civil Case No.:

**COMPLAINT**

**JURY TRIAL
DEMANDED**

Plaintiffs Eretz Goshen Farms Inc. and Warner P. Bass aka Yisroel Bass (collectively, "Plaintiffs") by their attorneys, Tamir Law Group P.C., by way of this Complaint against Auto Cure LLC, Cole Ducey, and Joseph Ducey (collectively, the "Defendants"), respectfully allege as follows:

### NATURE OF ACTION

1.      This is an action under law and equity to recover the purchase price and consequential damages stemming from Defendants failure to deliver two conforming machines that Plaintiffs had purchased and damages related to the abhorrent behavior of Defendants in the aftermath of Plaintiffs' decision to reject/revoke its acceptance of the nonconforming goods.

2.      Plaintiff Eretz Goshen Farms Inc. purchased what it believed were two entirely new and fully functioning machines from Defendant Auto Cure that were intended to be used in curing (drying) Plaintiff's crop of industrial CBD hemp.

3.      However, after delivery of the curing machines it became rapidly clear that the machines were non-conforming because:

      a.  from the very beginning various components kept failing;

    b.   Defendant Auto Cure's attempted solutions to the failures became exponentially more complicated and were nonetheless ineffective at making the machines function correctly;

    c.   Defendant Cole Ducey, Auto Cure's CEO, would eventually admit that an essential component of the curing machine was previously used and Defendant Auto Cure would not take responsibility for defects in that component; and

    d.   It became clear to Plaintiffs that even if the curing machines ever functioned that they would not even be able to come close to performing at the level that Defendants' Auto Cure and Joseph Ducey had represented.

4.    As a result, Plaintiff Eretz Goshen Farms Inc. decided to reject the delivery of the nonconforming machines and demand a complete refund of the purchase price.

5.    Defendant Auto Cure refused to refund the purchase price and Cole Ducey undertook an effort to intimidate, threaten, and humiliate Plaintiff Warner P. Bass, the principal of Eretz Goshen Farms Inc., through the use of threatening anti-Semitic text messages.

## **PARTIES**

6.    Plaintiff Eretz Goshen Farms Inc. ("EGF") is a New York corporation with its principal place of business located at 71 Dzierzek Ln, New Hampton, NY.

7.    Plaintiff Warner P. Bass aka Yisroel Bass ("Mr. Bass") is an individual who resides at 71 Dzierzek Ln, New Hampton, NY, and is the owner and manager of EFG.

8.    Defendant Auto Cure LLC ("Auto Cure") is a California limited liability company with its principal place of business located at 11675 Sorrento Valley Rd, San Diego, California, 92191.

9.      Defendant Cole Ducey is an individual who resides in California and is the Chief Executive Officer of Auto Cure.

10.      Upon information and belief, defendant Cole Ducey resides at 2606 N Mission Bay Dr., San Diego, California, 92109.

11.      Defendant Joseph Ducey is an individual who resides in California and is the Executive Vice President of Auto Cure.

12.      Upon information and belief, defendant Joseph Ducey 2187 Manchester Ave, Cardiff By The Sea, California 92007.

## VENUE AND JURISDICTION

13.      This Court has jurisdiction over the action pursuant to 28 U.S.C. § 1332(a)(1), in that this is a civil action between citizens of New York and citizens of California, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

14.      The Court has personal jurisdiction over Auto Cure under N.Y. C.P.L.R. 302 (McKinney) as Auto Cure did business in New York, including the sale of the machines at issue in this action. In addition, the victims of the intentional torts committed by Auto Cure are located in New York.

15.      The Court has personal jurisdiction over Cole Ducey under N.Y. C.P.L.R. 302 as the victims of the intentional torts he committed are located in New York.

16.      The Court has personal jurisdiction over Joseph Ducey under N.Y. C.P.L.R. 302 as the victims of the intentional torts he committed are located in New York.

17.      Venue is proper in this district under 28 U.S.C. § 1391(b)(1) and 28 U.S.C. § 1391(b)(1) in that a substantial part of the events that gave rise to the claim occurred in Orange County

New York which is within the confines of the Southern District of New York and that Defendants are subject to personal jurisdiction in this district with respect to this action.

18.     All of the Defendants knew or should have known at the time they committed the intentional torts alleged herein that the damage from those torts would be suffered in New York.

## FACTS COMMON TO ALL COUNTS

### I.     EGF and Hemp Production

19.     At all times hereinafter mentioned, Yisroel Bass was and is the founder, owner and President of EGF.

20.     On or about March 19, 2019, EGF became a New York licensed & authorized hemp grower.

21.     EGF was assigned the license number HEMP-G-000218 by the New York Department of Agriculture and Markets.

22.     EGF grew industrial CBD hemp in order to produce CBD. CBD is a non-psychoactive chemical that is produced when hemp is grown. CBD is used in both western medicine, primarily for the treatment of epilepsy, and homeopathic medicines that come in both edible and topical formulations. The CBD industry is experiencing significant growth in New York and throughout the United States.

23.     Industrial CBD hemp is a version of the cannabis plant which produces negligible THC, the psychoactive ingredient in marijuana.

24.     In order to obtain the CBD from the plant, it is necessary to dry the plant after harvest in order to produce a product that has approximately 10% moisture by volume.

25.     This drying process is known in the industry as curing.

4

26.     There are several methods to cure hemp plants including, but not limited to, the use of heat or the use of dehumidifiers.

**II.     EGF's Initial Contact with Auto Cure**

27.     In early 2019, Mr. Bass began to explore the most cost-effective ways of curing EGF's upcoming 2019 harvest.

28.     Upon information and belief, at all times hereinafter mentioned, Auto Cure claimed to sell the "first fully automated, all-in-one hardware and software cannabis curing system."[1]

29.     Auto Cure's largest model is sold with computer systems, fans, and dehumidifiers all contained within a 40 foot walk-in Carrier refrigeration chamber (the "Container Unit"). The cannabis (marijuana or hemp) is placed on baskets or racks that are kept within the Container Unit. If the Container Units worked as advertised, a combination of airflow, temperature, and humidity control would be used to cure the cannabis. Auto Cure claimed that up to 13,400 pounds of wet industrial hemp could be cured within a single Container Unit at one time.

30.     On or about February 14, 2019, Mr. Bass called Auto Cure and spoke with Joseph Ducey about Auto Cure's curing system and specifically asked about Auto Cure's Container Unit.

31.     On the same day, Joseph Ducey emailed Mr. Bass with the technical information regarding the Container Unit and made aggressive claims about the performance of Auto Cure's system including the promise of a 24% higher yield of CBD from EGF's harvest.

32.     On or about February 25, 2019, Mr. Bass emailed Joseph Ducey inquiring about any current customers that would be willing to talk to him regarding Auto Cure's self-contained walk-in

---

[1] See http://Auto Cure.us, last accessed on December 6, 2019.

refrigerator chambers.

33.     On or about February 26, 2019, Joseph Ducey provided Mr. Bass the phone number of a current customer who he claimed was happy with Auto Cure's product.

34.     On or about February 26, 2019, Joseph Ducey informed Mr. Bass that the customer providing the reference did not have the same unit Mr. Bass was considering ordering. The customer was in Canada and was using the Auto Cure device to dry medical marijuana instead of hemp for CBD.

35.     Mr. Bass proceeded to set up a call with the customer. The customer confirmed that the machine it was using was not the same machine that Mr. Bass was planning on using and that the customer was growing medical grade marijuana, not industrial grade hemp. The customer stated that there had been a software issue, but that Auto Care had resolved the issue. The customer said that overall they were happy with the product.

III.    **Negotiations for Purchase of the Auto Care Curing Machine: March 14, 2019 – July 9, 2019**

36.     On or about March 14, 2019, EGF entered into negotiations with Auto Cure for the purchase of its Container Units.

37.     Between about March 14, 2019 and July 9, 2019, EGF and Joseph Ducey were in contact via phone and email concerning the potential purchase of the Container Units.

38.     On one of the phone calls during that time, Joseph Ducey represented that Auto Cure had sales all throughout the United States, including the east coast and New York.

39.     EGF asked for additional customer references from customers on the east coast of the United States.

40. Joseph Ducey stated that additional references from customers on the east coast could not be provided due to non-disclosure agreements ("NDAs") entered into with these customers.

41. Joseph Ducey stated that the reason for these NDAs were the customers' worries of federal law issues regarding marijuana growth and sale.

42. On or about April 9, 2019, Mr. Bass inquired about the lead time for the delivery of the Container Units and about the cost of the units.

43. Joseph Ducey advised Mr. Bass that the lead time would be 8-10 weeks and that the Container Units would be $65,000.00 each.

44. On or about June 12, 2019, Mr. Bass contacted Joseph Ducey to inform him that a competing company, Mabre Air Systems, guaranteed that its curing device could dry industrial CBD hemp in 3 days or less with temperatures under 120 degrees Fahrenheit.

45. In response, Joseph Ducey emailed Mr. Bass claiming that if Mabre Air Systems were using a kiln, then the temperatures were going to get much hotter than the 120 degrees promised.

46. Joseph Ducey further claimed that if EGF were to use a kiln to dry its product, that it would boil off volatile oils along with the water.

47. Joseph Ducey claimed that Auto Cure's curing system and Container Units would take wet industrial hemp down to 5% - 10% moisture content in five days or less.

48. Joseph Ducey also sent a document to Mr. Bass stating that Auto Cure's curing process would yield a much more valuable product than hemp dried in a kiln or using any other method.

49. Joseph Ducey claimed that each refrigeration chamber would bring 12,500 pounds of wet industrial CBD hemp down to 10% moisture within 24 hours.

7

50.     Joseph Ducey assured EGF that Auto Cure's system was capable of such a process because it utilized metal baskets which allowed for greater capacity.

51.     As discussed in greater length *infra* in subsections XI – XII Joseph Ducey's fanciful claims about the efficiency and abilities of the Auto Cure system proved to be entirely unfounded.

52.     Joseph Ducey knew or should have known that these claims were false at the time he made them.

53.     It is clear from the context in which the claims were made that Joseph Ducey intended EGF to rely on them when deciding whether to purchase the Auto Cure Container Units.

54.     At the time, Mr. Bass inquired whether Joseph Ducey's representations had been confirmed by any industrial hemp growers in actual practice.

55.     Joseph Ducey told Mr. Bass that the claims were scientifically sound, and that Auto Cure would be doing a test run of 12,500 pounds of industrial hemp using the baskets in July in Oregon. As Joseph Ducey later claimed the baskets would not be available until November, it seems highly unlikely that such a test ever took place.

56.     Based on the documents provided and Joseph Ducey and Auto Cure's representations, EGF proceeded to purchase two Container Units from Auto Cure.

57.     On or about July 1, 2019, Joseph Ducey sent an email with an attachment that contained an express warranty covering new products purchased from Auto Cure.

58.     As discussed in more detail in subsection XI, at the time, in part because of the language in the warranty, EGF was under the impression that it would be purchasing a new, not previously used, product.

## IV.     Order of Auto Cure System and Aftermath

59.     On or about July 9, 2019, an order was made for two of the Container Units ("Chamber 1" and "Chamber 2").

60.     On or about July 9, 2019, EGF's understanding was that Auto Cure would deliver two entirely new and working Container Units. Each Container Unit was to be fully set up prior to delivery in a new Carrier refrigeration chamber. Each Container Unit would have the necessary dehumidifiers, fans, and other machinery necessary to dry industrial hemp from its natural moisture down to 10% moisture within five days.

61.     Additionally, Joseph Ducey and Auto Cure had led Mr. Bass to believe that EGF would be able to order the basket system to be delivered with the Container Units.

62.     Based upon those representation EGF believed that within 10 weeks, it would receive two Container Units that were each capable of curing 12,500 pounds of industrial hemp within 5 days.

63.     On or about July 12, 2019, EGF performed a wire transfer of $41,998.00 to serve as a deposit for Chamber 1.

64.     On or about July 31, 2019, EGF performed a wire transfer of $41,998.00 to serve as a deposit for Chamber 2 (with the deposit for Chamber 1, the "Deposits").

## V.     Post Deposit Pre-Delivery and the Revelation that the Basket System Would Not be Available

65.     Joseph Ducey's demeanor towards Plaintiff and its employees changed radically after the Deposits on both Chambers had been received.

66.     On or about and after August 1, 2019, Joseph Ducey was curt and expressed audible annoyance any time the Plaintiff and its employees contacted him.

67.    On or about August 16, 2019, Mr. Bass requested information on the baskets that would be housed within the individual curing units.

68.    Prior to the Deposits, Auto Cure had indicated that EGF would be able to subsequently purchase the basket system for its 2019 harvest which EGF planned to complete by October 16, 2019.

69.    However, in response to Mr. Bass' request, Joseph Ducey provided only a Computer-Aided Drawing (CAD), a technical drawing of the baskets, and, for the first time, informed EGF that these baskets would not be available until November 2019 at the earliest.

70.    On or about August 20, 2019, Joseph Ducey contacted Mr. Bass and claimed that the baskets provided by Auto Cure could actually bring 13,400 pounds of wet industrial CBD hemp to 10% moisture within 24 hours.

71.    Although that representation was enticing, it was of no use to EGF because Auto Cure was unable to provide the baskets before the date EGF would need them.

72.    That November date provided by Joseph Ducey for delivery of the baskets for Chamber 1 and Chamber 2 was after the last possible date for the harvest of EGF's crop  and thus EGF could not utilize the baskets for its 2019 harvest.

73.    EGF could not delay its harvest past October, as hemp that is left unharvested for too long will begin to mold and rot and, therefore, become unusable.

74.    In order to avoid losing the entire crop, Mr. Bass began looking for an alternative to Auto Cure's baskets in order to ensure that the refrigeration chamber and curing units could meet the promised yield.

75.    On or about August 26, 2019, Mr. Bass texted Joseph Ducey asking if the Auto Cure's designed baskets could be made quicker than the November 2019 time frame.

76.     On or about August 26, 2019, Joseph Ducey replied to Mr. Bass stating that there was "no chance" that the baskets could be delivered before November 2019.

77.     On or about August 29, 2019, Mr. Bass contacted Joseph Ducey regarding possible alternatives to the Auto Cure's designed baskets that could be acquired before the harvest.

78.     Mr. Bass tried to ask more questions about the baskets in order to determine what alternatives could be used. However, Joseph Ducey refused to answer any additional questions and instead treated EGF as if it was attempting to steal Auto Cure's basket design. Joseph Ducey, unprovoked and confusingly, repeatedly stated that Auto Cure was patenting the baskets.

79.     Instead of proposing alternatives that could handle the same amount of hemp, Joseph Ducey strongly recommended that EGF purchase Auto Cure's pan and rack system as an alternative.

80.     According to Auto Cure's own materials, this pan and rack system is capable of drying only 1,800 pounds of wet industrial CBD hemp to 10% moisture in approximately 10 days.

81.     Thus the pan and rack system, assuming it performed as well as Auto Cure claimed, took twice the length of time to cure a fraction of the 12,500 pounds Auto Cure had claimed the basket system could dry.

82.     On or about September 2, 2019, Auto Cure submitted a balance invoice to EGF regarding the purchased Container Units.

83.     On or about September 2, 2019, Joseph Ducey reminded Mr. Bass that he still needed to purchase Auto Cure's pan and rack system.

84.     On or about September 4, 2019, Joseph Ducey called Mr. Bass to inquire how the Auto Cure units were to be loaded.

85.     On the same day, Mr. Bass responded to Joseph Ducey that he was incredibly

11

disappointed that Auto Cure had no alternative available that would allow for drying anywhere close to the 12,500 pounds of wet hemp that had been promised before the Deposits.

86.     Mr. Bass stated in an email that EGF was considering the use of milk crates in order to meet the yield advertised by Joseph Ducey and Auto Cure.

87.     In response, Joseph Ducey stated that he cannot vouch or stand by the use of milk crates in the curing units.

88.     On September 4, 2019, over the course of a couple of phone calls, Joseph Ducey told EGF that Auto Cure would not ship the Container Units unless EGF purchased the pan and rack system.

89.     Joseph Ducey never committed to return the Deposits if Auto Cure did not ship the Container Units.

90.     On September 4, 2019, EGF had already paid over $80,000 in deposits to Auto Cure and the deadline to harvest its industrial CBD hemp crop was quickly approaching.

91.     Even if Auto Cure eventually agreed to return the Deposits, the return would not have been immediate and EGF would not have had those funds available to find an alternative curing solution prior to the harvest.

92.     Furthermore, any available alternative that could be ready in time for the October harvest would be temporary in nature, only lasting for one harvest, rather than a capital investment in a perennial solution, similar to what EGF was expecting from the Auto Cure Container Units.

93.     On September 4, 2019, EGF and Mr. Bass felt that given the money already invested in the Deposits, the lack of remaining capital, and the impending harvest that it had no choice but to purchase the pan and rack system due to Auto Cure's refusal to ship the Container Units unless EGF

did so.

94.     On or about September 5, 2019, Auto Cure submitted to EGF a revised invoice, dated September 2, 2019, that reflected the purchase of the pan and rack system.

95.     According to the September 2, 2019 invoice, the pan and rack system cost EGF an additional $48,505.00.

96.     On or about September 6, 2019, EGF submitted its final payment to Auto Cure.

97.     On or about September 10, 2019, EGF asked Nechama Eilfort, an acquaintance of Mr. Bass who lives near Auto Cure's headquarters, to check on the status of the ordered Container Units.

98.     On or about September 10, 2019, Ms. Eilfort, acting on behalf of EGF, traveled to Auto Cure's headquarters to check on the status of the ordered Container Units. While there she met with Cole Ducey who proceeded to show Ms. Eilfort what Cole Ducey claimed were the ordered Container Units.

99.     While at Auto Cure's headquarters, Ms. Eilfort took pictures of the claimed ordered Container Units and submitted those photographs to EGF.

100.    The pictures provided to EGF happened to include unique identifying numbers on the inside of the refrigerator containers.

101.    EGF later discovered that for one of the two ordered units, the delivered container number did not match either of the ones photographed by Ms. Eilfort.

102.    On or about September 13, 2019, Auto Cure texted Mr. Bass that Chamber 1 and Chamber 2 would be shipped on September 13, 2019, with tracking numbers.

103.    However, no tracking numbers were ever provided to EGF.

104.    On September 16, 2019, Auto Cure texted Mr. Bass that only Chamber 1 shipped and

that it would arrive the next day on September 17, 2019. This gave EGF only 24 hours' notice to find a crane that could unload Chamber 1.

105.    On September 16, 2019, Auto Cure texted Mr. Bass that Chamber 2 would be delivered on September 20, 2019.

106.    On September 17, 2019, Chamber 1 was delivered to EGF.

107.    On September 18, 2019, Mr. Bass texted Joseph Ducey inquiring about the delivery of Chamber 2.

108.    On September 18, 2019, Joseph Ducey stated that the delivery of Chamber 2 would be coming on September 19, 2019, one day earlier than previously stated.

109.    Again, EGF had only 24 hours' notice to find a crane that could unload Chamber 2.

110.    On or about September 19, 2019, despite EGF's frantic preparations, Chamber 2 was not delivered to EGF.

111.    On or about September 24, 2019, Chamber 2 was finally delivered after a five-day delay.

**VI.     Post Delivery the Auto Cure Container Units Have Immediate Issues**

112.    EGF took possession of both Container Units with the assurance from Auto Cure that there would be no significant set up as the Container Units came pre-set up. Additionally, Auto Cure had assured EGF that the units would be ready for immediate use.

113.    On or about October 3, 2019, Mr. Bass worked with Cole Ducey remotely in order to set up the Wi-Fi connection and initial set-up for both Chamber 1 and Chamber 2.

114.    On or about October 6, 2019, EGF began to load Chamber 1 and Chamber 2 with the wet industrial CBD hemp.

115.     On or about October 8, 2019, EGF noticed that a dehumidifier in Chamber 1 was not working.

116.     On the same day, Mr. Bass reached out to Cole Ducey about the dehumidifier not working in Chamber 1 in order to receive information about how to repair it.

117.     On or about October 8, 2019, Mr. Bass followed Cole Ducey's instructions regarding how to troubleshoot the dehumidifier in Chamber 1.

118.     On or about October 8, 2019, Cole Ducey, after conducting troubleshooting with Mr. Bass, determined that the dehumidifier was defective and stated that the manufacturer would be sending a new dehumidifier.

**VII.     The Problems Intensify – Uneven Drying and Mold Growth**

119.     On or about October 10, 2019, EGF noticed that the hemp in both Chamber 1 and Chamber 2 was not drying evenly and that significant mold growth was accruing.

120.     On the same day, EGF notified Cole Ducey about the mold growth occurring in Chamber 1 and Chamber 2.

121.     In response, Cole Ducey initially claimed that such mold growth is normal and likely not from inside the unit but rather must have been pre-existing mold from the harvest. However, the harvest crop that was hanging in EGF's barn was not growing mold.

122.     Cole Ducey said that mold growth would only occur in the Auto Cure unit if the humidity was too high and denied that was the case.

123.     However, in response to the mold, Cole Ducey did instruct EGF to lower the humidity settings.

124.     Also, on or about October 10, 2019, Cole Ducey instructed EGF to remove one of the

carbon filters from the internal fans in Chamber 1.

125.    On or about October 13, 2019, after noticing that the hemp continued to dry unevenly and continued to grow mold, EGF decided to decrease the amount of industrial CBD hemp in each Container Unit from 1800 pounds to 900 pounds. EGF did so in an attempt to save the crop as the Auto Cure system was clearly unable to handle a "full" load.

126.    On the same day, Cole Ducey admitted that the humidity had been at 70% for at least 24 hours, which he had previously indicated was problematically high.

127.    Later in the text message exchange on October 13, 2019, Cole Ducey told EGF that there exists a "simple" fix for the humidity issue that involves disabling a "failsafe for the dehumidifiers" and that all that would be required is a rewiring of the refrigerators which should be done in the presence of an "electrical person".

128.    Auto Cure did not offer to send anyone to perform this alteration to the electrical system.

129.    Cole Ducey also instructed EGF to remove the remaining filters from the internal fans.

130.    These instructions indicated that the Container Units, as delivered, could not perform as represented and were non-conforming.

131.    However, EGF, in good faith and facing the quickly approaching harvest deadline, decided to work with Auto Cure to provide Auto Cure with an opportunity to repair the units in order to make them conform to the promised performance levels.

132.    Mr. Bass did note at the time that if the Container Unit was unable to manage effectively curing 1800 wet pounds of industrial hemp with the pan and rack system, he did not think it was at all possible that the same Container Unit could have effectively cured 12,500 wet pounds of

industrial hemp.

133.    Also on or about October 13, 2019, EGF contacted an electrician to perform the alterations. The Electrician couldn't come to the farm until Wednesday October 16, 2019.

134.    In response to finding out the electrician was not immediately available, Cole Ducey tried to convince an EGF employee to undertake the rewiring alteration.

135.    However, the employee did not feel safe doing so as, despite Cole Ducey's representations, the procedure appeared to be complicated.

136.    On or about October 15, 2019, EGF noticed further mold development on the industrial CBD hemp in both Chamber 1 and Chamber 2.

137.    On the same day, after noticing the mold growth, Mr. Bass told Cole Ducey that the hemp that was hang drying outside of the Container Units had no mold growth, whereas "these autocure [sic] are a mold factory."

138.    In response to EGF raising the continued concerns of mold with Auto Cure, Cole Ducey told Mr. Bass that after the electrician altered the wiring and the new humidifier was delivered, which was also scheduled to occur the next day, EGF should get rid of the hemp that was currently in the Container Units and reload with fresh hemp.

139.    However, Cole Ducey instructed EGF to initially load only 17 carts of pans on racks, and then later add another 16 carts. The normal load for each unit was 52 carts.

**VIII.    Despite Following Auto Cure's Instructions, Multiple New System Failures Occur**

140.    On or about October 16, 2019, the electrician arrived and performed the alterations to the electrical systems for the dehumidifiers in both Chambers 1 and 2.

141.    The electrician reported that the compressor on one of the units was not performing

correctly and that Carrier, the refrigerator container manufacturer, would need to be contacted, a concern that Mr. Bass relayed to Cole Ducey on the same day.

142.    Also on October 16, 2019, the internal fans stopped running on Chamber 1.

143.    The failure of Chamber 1's internal fans put the industrial CBD hemp in Chamber 1 at further risk for mold.

144.    EGF, therefore, worked with Auto Cure to figure out a temporary solution.

145.    Cole Ducey remotely conducted a trouble shooting process with EGF regarding Chamber 1's internal fan issue.

146.    Cole Ducey told EGF that he had reached the conclusion that there was an issue with the breaker within Chamber 1, yet he did not disclose if this was related to the alteration that he had instructed be undertaken.

147.    On the same day, October 16, 2019, Daniel Wright, an employee of EGF, under the instructions of Cole Ducey, connected the internal fans in Chamber 1 to a separate power source, one not wired to the Container Unit's internal computer, in order to keep them running.

148.    At the end of the day on October 16, 2019, it was becoming increasing clear that despite repeated attempts to work with Auto Cure to make the non-conforming units actually work, the problems continued to intensify. Although the failsafes on the humidifiers were now removed from each unit, Chamber 1 was exhibiting even greater problems, its fans were no longer being controlled by Auto Cure software, the breaker had an issue that caused it to keep flipping, and the compressor had an issue that the electrician believed that Carrier would need to address.

149.    Despite these failures, Auto Cure did not send a technician to repair the units nor did it arrange for Carrier to come repair the issues.

150.    On October 17, 2019, Cole Ducey sent a text that stated that the humidity levels were decreasing in Chamber 1 due to the repairs that the electrician made.

151.    However, despite the measurable decrease in humidity in Chamber 1, the mold continued to spread throughout the hemp in the unit, dispelling the notion that Chamber 1 was operating as promised.

## IX.    Chamber 2 Overheats Damaging the Hemp Crop

152.    On or around October 20, 2019, EGF noticed that the temperature within Chamber 2 was at 107 degrees Fahrenheit and that the temperature sensor readout on the Carrier refrigerator unit was displaying the error codes "AL54", which signifies a primary supply air sensor failure, and "AL59" which signifies a heat termination thermostat safety error.

153.    Chamber 2's temperature of 107 degrees Fahrenheit was well above the programmed temperature of 65 degrees Fahrenheit.

154.    As a result of the very high temperature in Chamber 2, the industrial CBD hemp was damaged by being too dried out.

155.    The moisture level of correctly cured product is supposed to be 10%, however, the moisture on the hemp that had been in the high temperature environment within Chamber 2 was so low that it did not register as having any moisture remaining.

156.    EGF immediately contacted Auto Cure regarding the high temperature within Chamber 2.

157.    Auto Cure stated to EGF that Chamber 2 must have disconnected from Wi-Fi and that is why Auto Cure was unaware of the high temperature. Even if true, that alone would not explain the high temperature - only Auto Cure's failure to respond to it.

19

158.     Auto Cure recommended to EGF that Chamber 2 should be restarted and then reconnected, however, Auto Cure had no immediate fix to ensure that the temperature did not spike again.

**X.     The Container Units Are Demonstrably Non-Conforming – Thus EGF Demands a Refund**

159.     On or about October 23, 2019, EGF determined that Chamber 1 and Chamber 2 had never functioned as advertised by Auto Cure and despite EGF spending significant time, energy, and resources attempting to fix both Container Units it was now clear that both units were never going to function as Auto Cure had represented prior to EGF's purchase.

160.     Therefore, on October 23, 2019, Mr. Bass emailed Joseph Ducey stating that both Chamber 1 and Chamber 2 had never functioned as advertised and as a result of the non-conformity EGF was requesting a refund for Chamber 1 and Chamber 2 and for Auto Cure to pick up the Container Units.

161.     That same day Joseph Ducey replied via email that Auto Cure would not issue a refund and that Auto Cure would not pick up units and instead offered to pay for the electrician to continue to conduct repairs.

162.     On or about October 24, 2019, acting as if EGF had not rejected the non-conforming units, Cole Ducey contacted Mr. Bass reiterating that Auto Cure would be willing to pay for an electrician to repair both Container Units. Auto Cure never actually paid the electrician.

163.     Cole Ducey additionally stated to Mr. Bass that Auto Cure would be sending additional parts to help facilitate repairs within both Chambers.

164.     On or about October 25, 2019, as an act of good faith EGF made one last attempt

to use Chamber 1 and Chamber 2 again to try and dry some of the industrial CBD hemp crop.

165.    However, that attempt was also unsuccessful.

166.    On or about October 28, 2019, given that both Container Units were non-conforming and Auto Cure refused to provide a refund, EGF made the decision to begin to initiate the chargeback process with the credit cards it had used for the final purchase amount.

**XI.    Auto Cure Discloses for the First Time that the Carrier Refrigerator Units have been Previously Used**

167.    On November 1, 2019, the temperature sensor in Chamber 2 failed for a second time, again displaying the error code "AL54."

168.    In response, on the same day, Cole Ducey revealed for the first time that the refrigerator containers that Auto Cure had used for both Chamber 1 and Chamber 2 were actually previously **<u>used</u>** refrigerator units and thus such faulty sensors should be expected.

169.    Neither EGF nor Mr. Bass were ever previously made aware that Auto Cure was planning on using used refrigerator containers for either Chamber 1 or Chamber 2.

170.    When Mr. Bass informed Cole Ducey that EGF had not chosen used units, Cole Ducey claimed that EGF had chosen used units to save $30,000.00.

171.    However, the first price quoted by Auto Cure was $65,000 per container unit and the actual final sales price was $69,999.

172.    The fact that the refrigerator chambers were used was never reflected in any invoice submitted to EGF, nor was any price reduction reflected.

173.    EGF never opted to pay less for a used refrigerator chambers over new refrigerator chambers.

174.     Prior to the purchase, Auto Cure had represented to EGF that it was purchasing new refrigerator chambers.

## XII.     EGF Ceases to Attempt to Use the Non-Conforming Container Units

175.     After November 1, 2019, EGF no longer made any attempt to use the non-conforming Container Units.

176.     Despite spending significant time and resources attempting to repair the units to make them conforming, neither unit ever worked as represented by Auto Cure.

177.     Furthermore, the refrigerator containers that Auto Cure utilized were previously used and Auto Cure did not consider itself responsible for error messages on the refrigerator unit.

178.     For all of those reasons, it was clear that the Container Units would never be conforming regardless of how many opportunities Auto Cure was given to repair or replace any part of the system.

179.     At no point during its possession of the Container Units did any employee or agent of EGF represent to anyone at Auto Cure that the units were working as intended

180.     As a result of the failure of the Auto Cure Container Units to function properly, EGF lost the entire Industrial Hemp Crop it had tried to dry in the machines, approximately 3,600 pounds of wet industrial hemp.

181.     By the conclusion of its use of the Auto Cure Machines, EGF had spent $258,245.26 directly attributable Auto Cure as follows:

       a.     $199,839.00 to Auto Cure for the purchase of two Container Units and the pan and rack system;

       b.     $30,328.51 on installation costs both before and after deliver of the Container Units;

    c.  $28,390.76 on power generation capabilities and fuel.

182.  In addition, the roughly 3,600 pounds of wet industrial hemp lost as a result of the attempts to use the Auto Cure System would have equated to about 720 pounds of cured CBD Hemp had it not been destroyed.

183.  Cured CBD Hemp has commercial value of approximately $500 a pound.

184.  Thus, the lost CBD Hemp product attributable directly to the use of the Auto Cure system had a commercial value of approximately $360,000.

**XIII.   EGF Mitigates its Damages**

185.  EGF took all reasonable business steps to mitigate its damages, both before it rejected the Container Units by giving Auto Cure ample opportunity to conform the goods to what was promised and by taking all necessary steps to save the remainder of its harvest of industrial hemp.

186.  EGF was forced to undertake costly measures to create a temporary alternative in order to dry the remainder of the crop, namely renting a warehouse, fans, and dehumidifiers to set up its own curing room. In addition, since the warehouse was not on the farm, EGF had to hire security to guard the hemp.

187.  Through its extensive mitigation efforts, EGF was able to save most of the remaining crop from its harvest.

188.  However, as a result of the delay in setting up the alternative, caused by Auto Cure's repeated attempts to conform its Container Units, EGF ultimately lost some of its remaining crop to mold and rot.

189.  These consequential damages, both the costs of the temporary curing room and the lost crop, were reasonably foreseeable to Auto Cure.

190.    EGF spent $89,268.74 on setting up the temporary curing room to mitigate its damages.

### XIV.   EGF Attempts to Recover the Purchase Price and Cole Ducey Responds with Anti-Semitic Harassment and Intimidation

191.    Upon information and belief, on or abour November 9, 2019, Auto Cure learned of EGF's decision to initiate the chargeback process on the credit cards used to make the final payment to Auto Cure.

192.    On or about November 9, 2019, Cole Ducey texted Mr. Bass and wrote: "You won't win the dispute and it just shows what kind of filth you are for do so" and then added in a second text "And a coward too." It is possible Cole Ducey sent additional texts as well, but a unsettled Mr. Bass blocked his phone number temporarily.

193.    On or about November 11, 2019, by a letter from its attorneys, Tamir Law Group, EGF again notified Auto Cure that it demanded the return of the purchase price of both Chamber 1 and Chamber 2, and to the extent that it had previously accepted the delivery of the units, EGF was revoking its acceptance.

194.    The November 11, 2019 letter also requested that Auto Cure cease sending inappropriate and harassing text messages to Mr. Bass and other EGF employees.

195.    After receiving the letter, Auto Cure again refused refund the purchase price.

196.     On November 21, 2019, in an effort to harass and intimidate EGF and Mr. Bass, Cole

Ducey, having been previously blocked by Mr. Bass sent EGF's electrician the following string of

anti-Semitic threats and messages[2]:

> Text 1: 11:46 PM: You think this is a fucking game you fucking kike
> bitch
>
> Text 2: 11:46 PM: Shove that fucking candle up your faggot ass and
> pray to your kike God
>
> Text 3: 11:51 PM: Tell Yisriol [Mr. Bass] that I will sue him until he
> fucking begs his kike god to stop
>
> Text 4: 11:51 PM: And still I won't
>
> Text 5: 11:52 PM: Or he can shut the fuck up and sit down
>
> Text 6: 11:55 PM: You fucking coward bitch
>
> Text 7: 11:57 PM: You understand that everything you believe in is
> bullshit
>
> Text 8: 11:57 PM: Your women are beat
>
> Text 9: 11:58 PM: You give nothing to society

197.     After midnight, now on November 22, 2019, Cole Ducey continued to attempt to

intimidate and harass by continuing to text anti-Semitic threats and messages

> Text 10: 12:28 AM: Tell Yisrieol [Mr. Bass] the secret service will be
> calling him
>
> Text 11: 12:28 AM: Fucking kike bitch
>
> Text 12: 3:30 AM: You understand that kikes are like rats right?? You
> steal money from people and pretend that you're a fucking
> victim.

198.     Mr. Bass found the text messages extremely disturbing. He was extremely concerned

for both his safety and the safety of his family which all live on the same property as the EGF farm.

---

[2] Plaintiffs and Tamir Law Group regret being forced to put this language into the record.
However, there is no other way to convey the gravity of Cole Ducey's obscene and indefensible
behavior.

199.    Upon information and belief, Cole Ducey sent the texts with the intended goal of terrorizing and intimidating Mr. Bass as a means of stopping him from filing this Complaint and continuing the credit card chargeback process.

200.    These messages were received just after a widely covered alleged anti-Semitic knife attack that had occurred in nearby Ramapo, New York the day before Mr. Ducey's texts.[3]

201.    The timing of the texts, just after the attack, served to amplify Mr. Bass' fear and emotional distress.

## FIRST CLAIM FOR RELIEF AGAINST DEFENDANT AUTO CURE
### (*Breach of Contract*)

202.    Plaintiffs repeat and re-alleges each of the foregoing allegations as though fully set forth herein.

203.    The parties, for valuable consideration, entered into a valid and enforceable contract on or about July 9, 2019, for the production and delivery of Chamber 1 and Chamber 2 from Auto Cure in return for an initial deposit and subsequent payments by EGF.

204.    Pursuant to the contract, Auto Cure was to deliver two new self-contained curing units that would reduce the moisture level within EGF's industrial CBD hemp crop.

205.    On or about July 9, 2019, an order was made for two of the self-contained refrigeration chambers.

206.    On or about July 12, 2019, EGF performed a wire transfer of $41,998 to serve as a deposit for Chamber 1.

---

[3] *See* https://www.nytimes.com/2019/11/20/nyregion/ramapo-police-monsey-stabbing-synagogue.html.

207.    On or about July 31, 2019, Plaintiff Eretz Goshen Farm Inc. performed a wire transfer of $41,998 to serve as a deposit for Chamber 2.

208.    On or about September 6, 2019, EGF submitted its final payment to Auto Cure.

209.    In breach of the contract, Auto Cure's Container Units were built into used refrigerator containers, instead of new, for both Chamber 1 and Chamber 2.

210.    In breach of the contract, the Chambers supplied by Auto Cure were riddled with defects that Auto Cure was not able to remedy.

211.    In breach of the contract, the Container Units supplied by Auto Cure were not capable of drying industrial CBD hemp.

212.    Auto Cure's breach of contract has damaged EGF in an amount to be determined at trial but not less than $700,000.

213.    EGF is entitled to recover at a minimum, the $258,558.27 it spent directly attributable to the purchase of the Auto Cure Container Units, the $360,000 value of the hemp crop it lost, the $89,268.74 it spent to mitigate its damages, and all other damages demonstrated at trial.

## SECOND CLAIM FOR RELIEF AGAINST DEFENDANT AUTO CURE

(*Unjust Enrichment*)

214.    Plaintiffs repeat and re-alleges each of the foregoing allegations as though fully set forth herein.

215.    Auto Cure was enriched by the payment of $199,839.00 for the non-conforming Chamber 1 and Chamber 2.

216.    Neither Chamber 1 nor Chamber 2 ever worked properly.

217.    EGF, almost immediately after delivery of Chamber 1 and Chamber 2, informed Auto

27

Cure that Chamber 1 and Chamber 2 were not functioning as intended.

218.    EGF never communicated to Auto Cure that Chambers 1 or 2 functioned as intended.

219.    EGF never communicated to Auto Cure that Chambers 1 or 2 functioned after the numerous repairs completed on both units.

220.    On or about October 23, 2019, Mr. Bass emailed Joseph Ducey stating that as a result of non-conformity EGF was requesting a refund for Chamber 1 and Chamber 2 and for Auto Cure to pick up the Chambers.

221.    As a result of Chamber 1 and Chamber 2 never functioning as promised and EGF constant and immediate communication of such, there was never any acceptance of either chamber from Auto Cure.

222.    Therefore, Auto Cure has been unjustly enriched by the payments made by EGF for products never accepted.

223.    Auto Cure's unjust enrichment has damaged EGF in the amount of $199,839.00.

### THIRD CLAIM FOR RELIEF AGAINST DEFENDANT AUTO CURE
*(Violation of the Implied Covenant of Good Faith and Fair Dealing)*

224.    Plaintiffs repeat and re-alleges each of the foregoing allegations as though fully set forth herein.

225.    New York law implies a duty of good faith and fair dealing into every express contract. *Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004).

226.    Only after receiving the Deposits of $83,996.00 paid between July 12 and July 31, 2019, did Joseph Ducey inform EGF that the basket system would not be ready in time for EGF's harvest.

227.     Auto Cure then refused to ship the Container Units unless EGF agreed to purchase the rack system which EGF did not want to purchase.

228.     Furthermore, on November 22, 2019, Cole Ducey, Chief Executive Officer and agent of Auto Cure, sent horrific anti-Semitic remarks intended for Mr. Bass following EGF demanding a refund, threatening litigation, and disputing the charges with the credit card companies.

229.     Cole Ducey's clear and unambiguous abhorrent behavior targeting Mr. Bass's faith and race, was intentionally dishonest and breached the covenants of Good Faith and Fair Dealing.

230.     Auto Cure's violation of the implied covenants of Good Faith and Fair Dealing has damaged EGF in an amount exceeding $700,000.00.

## FOURTH CLAIM FOR RELIEF AGAINST DEFENDANT AUTO CURE

(*Breach of Implied Warranty*)

231.     Plaintiff repeat and re-alleges each of the foregoing allegations as though fully set forth herein.

232.     Auto Cure is a merchant with respect to machinery that is intended to cure cannabis.

233.     On or about July 9, 2019, EGF placed an order with Auto Cure for two self-contained refrigeration chambers needed to cure Industrial CBD hemp.

234.     An implied warranty that the chambers were merchantable arose by operation of law as part of the sale.

235.     Auto Cure breached the implied warranty of merchantability in that the chambers were not fit for the ordinary purposes for which such curing chambers are used in that:

a.     On or about October 8, 2019, the dehumidifier in Chamber 1 did not work and as a result mold damaged the industrial CBD hemp crop.

b.  On or about October 15, 2019, EGF noticed further mold development on the industrial CBD hemp in both Chamber 1 and Chamber 2 despite the repairs made and was instructed to further decrease the amount of wet industrial CBD hemp loaded into the machines.

c.  On or about October 16, 2019, Chamber 1's internal fan stopped running putting the industrial CBD hemp in Chamber 1 at further risk for mold.

d.  On or around October 20, 2019, Chamber 2 reached a temperature of 107 degrees, despite monitoring systems within chamber that would have alerted Auto Cure, which further damaged the industrial CBD hemp crop

236.   EGF notified Auto Cure immediately upon the various defects and problems facing the Container Units. Therefore, all notifications were made after a reasonable time upon discovery.

237.   Auto Cure's breach of implied warranty has damaged EGF in an amount exceeding $700,000.00.

## FIFTH CLAIM FOR RELIEF AGAINST DEFENDANT AUTO CURE AND JOSEPH DUCEY

*(Fraud in the Inducement)*

238.   Plaintiffs repeat and re-alleges each of the foregoing allegations as though fully set forth herein.

239.   On or about February 14, 2019, Joseph Ducey emailed Mr. Bass stating that Auto Cure's system could produce a 24% higher yield of CBD from EGF's harvest over competitors.

240.   On or about June 12, Joseph Ducey emailed Mr. Bass claiming that Auto Cure's curing system and Container Units would take wet hemp down to 5% - 10% moisture content in

five days or less.

241.     On or about June 13, 2019, Joseph Ducey claimed that each Container Unit could bring 12,500 pounds of wet industrial CBD hemp down to 10% moisture within 24 hours.

242.     On or about June 13, 2019, Joseph Ducey claimed that Auto Cure's curing system was capable of such a process because it utilized metal baskets which allowed for greater capacity.

243.     On or about June 13, 2019, Joseph Ducey implied that if EGF were to purchase Auto Cure's products that these higher capacity baskets would be available to order as well. For example, Joseph Ducey claimed a test using the basket system was planned for July in Oregon.

244.     Defendants Joseph Ducey and Auto Cure knew that their representations were false and made them to induce EGF to pay the Deposits and purchase the Container Units.

245.     Auto Cure was never capable of producing a device that could fulfill Joseph Ducey and Auto Cure's promises and Joseph Ducey and Auto Cure knew this.

246.     EGF justifiably relied on the misrepresentations made by Defendants Auto Cure and Joseph Ducey by paying the Deposits and making the final payments.

247.     Auto Cure's and Joseph Ducey's fraudulent inducement has damaged EGF in an amount exceeding $700,000 as it would not have purchased the chambers but for the misrepresentations.

248.     Furthermore, EGF should be entitled to punitive damages and attorneys' fees for Joseph Ducey's and Auto Cure's fraud.

### SIXTH CLAIM FOR RELIEF AGAINST DEFENDANT AUTO CURE
(*Proper and Timely Exercise of the Right of Revocation of Acceptance under NY UCC §2-608*)

249.     Plaintiffs repeat and re-alleges each of the foregoing allegations as though fully set

forth herein.

250.     On or about July 9, 2019, EGF placed an order with Auto Cure for the two Container Units.

251.     On or about October 23, 2019, Mr. Bass emailed Joseph Ducey stating that as a result of non-conformity of the Chambers and the failure of the numerous repairs made in order to try and make them conform that that EGF was requesting a refund for Chamber 1 and Chamber 2 and for Auto Cure to pick up the Container Units.

252.     On or about November 11, 2019, EGF again notified Auto Cure that it was rejecting the goods it had been delivered and, to the extent it had previously accepted those goods, was revoking its acceptance of both Chamber 1 and Chamber 2. EGF again demanded a refund.

253.     EGF, as a result of the non-conforming product Auto Cure sold to Plaintiff, had a justifiable right to reject the goods and/or revoke acceptance of the non-conforming goods.

254.     EGF, on numerous occasions throughout October 2019 and with virtually no delay, informed Auto Cure that the Container Units sold to Plaintiff were non-conforming

255.     On or about October 23, 2019, EGF properly exercised its right to revoke acceptance of the chambers within a reasonable amount of time.

256.     Auto Cure's failure to honor EGF right to revoke acceptance has damaged Plaintiff in an amount exceeding $700,000.00.

## SEVENTH CLAIM FOR RELIEF AGAINST DEFENDANT COLE DUCEY

(*Intentional Infliction of Emotional Duress/Harassment Based on Race and Religious Beliefs*)

257.     Plaintiffs repeat and re-alleges each of the foregoing allegations as though fully set forth herein.

258.    On November 21 through November 22, Cole Ducey texted horrendous and threatening anti-Semitic speech to the previously hired electrician to forward to Mr. Bass. Demanding that the electrician tell Mr. Bass about the texts.

259.    Cole Ducey intended to cause severe emotional distress to Mr. Bass through his communication to the electrician.

260.    As a result of Cole Ducey's communications, Mr. Bass started fearing for his safety and the safety of his family and, as a result, suffered severe emotional distress.

261.    As a result of Cole Ducey's xenophobic hate speech Mr. Bass felt humiliated and discriminated against, and as a result, suffered severe emotional distress.

262.    Cole Ducey's extreme and outrageous conduct has caused Mr. Bass severe emotional distress and has damaged Mr. Bass in an amount exceeding $500,000.

263.    In addition, Mr. Bass should be entitled to punitive damages and attorneys' fees.

### EIGHTH CLAIM FOR RELIEF AGAINST DEFENDANT AUTO CURE
(*Economic Duress*)

264.    Plaintiffs repeat and re-alleges each of the foregoing allegations as though fully set forth herein.

265.    New York law recognizes economic duress as right to void a contract when it is demonstrated that one part to a contract has threatened to breach the agreement by withholding goods unless the other party agrees to some further demand. *Austin Instrument, Inc. v. Loral Corp.*, 29 N.Y.2d 124, 130 (N.Y. 1971).

266.    On or about August 16, 2019, Mr. Bass requested information on the baskets that would be housed within the individual curing units purchased from Auto Cure LLC.

267.    In response to Mr. Bass' request, Joseph Ducey informed EGF that these baskets would not be available until November 2019 which was far too late to assist with EGF's harvest.

268.    On or about August 26, 2019, Mr. Bass texted Joseph Ducey asking if the Auto Cure's designed baskets could be made quicker than the November 2019 time frame to which Ducey replied that there was no chance the baskets could be delivered in time.

269.    On or about August 29, 2019, Mr. Bass contacted Joseph Ducey regarding possible alternatives to the Auto Cure's designed baskets that could be acquired before the harvest.

270.    Instead of proposing alternatives that could handle the same amount of hemp, Joseph Ducey strongly recommended that EGF purchase Auto Cure's pan and rack system as an alternative.

271.    On or about September 2, 2019, Joseph Ducey again asked EGF to purchase Auto Cure's pan and rack system.

272.    On or about September 4, 2019, Joseph Ducey called Mr. Bass to inquire how the Auto Cure units were to be loaded.

273.    Mr. Bass stated that he was considering the use of milk crates in order to meet the yield advertised by Joseph Ducey and Auto Cure.

274.    In response, Joseph Ducey told EGF on a phone call that Auto Cure would not ship either Chamber unless EGF purchased the rack system from Auto Cure.

275.    Joseph Ducey never committed to refunding the Deposits in the event that EGF did not purchase the pan and rack system.

276.    On September 4, 2019, EGF and Mr. Bass felt that given the money already spent and the impending harvest, EGF had no choice but to purchase the pan and rack system due to Auto Cure's refusal to ship the Container Units unless EGF did so.

277.   According to an Auto Cure issued invoice, the pan and rack system cost EGF an additional $48,505.00.

278.   Auto Cure's abhorrent behavior in extorting EGF to purchase Auto Care's pan and rack system has rendered the contract voidable on the grounds of duress.

279.   As a result of Auto Cure's business compulsion and subsequent refusal to issue a refund Auto Cure has damaged EGF in an amount exceeding $700,000.00.

**NINTH CLAIM FOR RELIEF AGAINST DEFENDANTS**

*(Vicarious Liability)*

280.   Plaintiffs repeat and re-alleges each of the foregoing allegations as though fully set forth herein.

281.   Defendant Joseph Ducey, at all times hereinafter mentioned, acted as the Executive Vice President of Auto Cure.

282.   Joseph Ducey was the main source of contact for all negotiation regarding EGF purchase of the chambers from Auto Cure.

283.   Joseph Ducey presented himself to Mr. Bass, and by extension EGF, as being able to bind Auto Cure to any agreement reached.

284.   Therefore, Auto Cure is vicariously liable for the actions of its employee Joseph Ducey in his fraudulent inducement of EGF to purchase the Container Units.

285.   Defendant Cole Ducey, at all times hereinafter mentioned, acted as the Chief Executive Officer of Auto Cure.

286.   Cole Ducey was the main source of contact for all repairs and set-up regarding EGF purchase of the chambers from Auto Cure.

287.    Cole Ducey presented himself to Mr. Bass, and by extension EGF, as being able to bind Auto Cure to any agreement reached.

288.    Therefore, Auto Cure is vicariously liable for the actions of its employee Cole Ducey in his intentional infliction of distress when he targeted Mr. Bass with hate speech that was intended to intimidate and terrorize Mr. Bass. He made those threats and harassing statements while in the course of his role as CEO.

289.    As a result, Auto Cure's has vicarious liability for Joseph and Cole Ducey's intentional torts in an amount exceeding $1,200,000.

**WHEREFORE**, Plaintiffs demand judgment in their favor and against Defendants in an amount not less than $1,200,000 plus both contractual and statutory interest, compensatory damages, consequential damages, incidental damages, punitive damages, attorneys' fees, costs of suit, and any other relief the Court deems appropriate.

## JURY TRIAL DEMAND

Plaintiffs demand a Trial by Jury in this action on each and every one of their claims

Dated:          New York, New York
                December 6, 2019

                                        Respectfully submitted,

                                        **TAMIR LAW GROUP PC**



                                        _____
                                        Zaki Tamir
                                        Attorneys for Plaintiff
                                        80 Broad Street, Suite 1302
                                        New York, New York 10004
                                        (212) 444-9970